UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
Civil Action No.

| | |
|---|---|
| MARGARET SELIG,<br><br>    Plaintiff,<br><br>v.<br><br>SIEMENS GOVERNMENT TECHNOLOGIES, INC.,<br><br>    Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Margaret Selig ("Plaintiff" or "Ms. Selig") brings this action for violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§2000e *et seq*. ("Title VII"), the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq*. ("EPA"), and wrongful discharge in violation of public policy under N.C. Gen. Stat. § 143-422.1, and alleges the following:

**PARTIES**

1. Ms. Selig was a resident of Denver, North Carolina at all times she was employed by Defendant.

2. Defendant Siemens Government Technologies, Inc., is a North Carolina corporation, registered to do business in North Carolina, with a registered office located 160 Mine Lake Court, Suite 200, Raleigh, North Carolina. Defendant employed Ms. Selig during the events giving rise to this action.

**JURISDICTION AND VENUE**

3. This Court has original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims under Title VII and the EPA because the claims arise under the laws of the United States.

4. This Court has personal jurisdiction over Defendant because Plaintiff was hired to work in this district and Defendant conducts business in this district.

5. At all times relevant to this action, Plaintiff was an "employee" within the definition of Title VII, 42 U.S.C.§2000e *et seq.* (specifically, 42 U.S.C. § 2000e(f)), and therefore covered by the protections of Title VII.

6. At all relevant times herein, Defendant was an "employer" within the definition of Title VII, 42 U.S.C.§2000e *et seq.* (specifically, 42 U.S.C. § 2000e(b)).

7. At all times relevant to this action, Defendant possessed and exercised the power and authority to direct, control and supervise the work performed by Ms. Selig.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was hired to work in this district and Defendant conducts business in this district.

## ADMINISTRATIVE EXHAUSTION

9. Plaintiff satisfied her obligation to exhaust her administrative remedies by timely filing a Charge of Discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on sex and retaliation.

10. Plaintiff filed a charge with the EEOC on March 28, 2022.

11. The EEOC issued a Notice of Right to Sue on October 13, 2022. Plaintiff timely brings this action within ninety (90) days of his receipt thereof.

12. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## GENERAL ALLEGATIONS

14. On or about April 10, 2017, Ms. Selig began working for Defendant as a "Technical Director of Measurement and Verification." At that time, Ms. Selig had 32 years of experience as

an energy engineer. She has been a professional engineer since 1989 and earned her engineer degree in 1986. She has always excelled in her positions and is well-respected in the industry.

15. Defendant has stated that Ms. Selig's employment began on or about November 11, 2007, which is inaccurate and demonstrates that Defendant never exercised any due diligence or due care to understand or be knowledgeable about Ms. Selig's employment.

16. At all relevant times, Plaintiff was employed full-time by Defendant and worked at least forty (40) hours per week.

17. Plaintiff received paychecks for her work performed for Defendant.

18. In June of 2017, Ms. Selig started raising concerns regarding the lack of focus and resources on Operations, Maintenance, Repair and Replacement ("OMRR") contractual obligations.

19. In October of 2019, Ms. Selig convened an internal OMRR working group in order to attempt to obtain a collaboration/consensus and focus on OMRR responsibilities.

20. In March of 2020, Ms. Selig created a power point presentation for management to review regarding the need to focus on OMRR responsibilities.

21. In June of 2020, Ms. Selig completed the MIT Operational Excellence program after being one of eight (8) employees selected for the program.

22. In March of 2021, a new project manager, Doug Williams ("Mr. Williams") was assigned to take over the OMRR responsibilities. Mr. Williams' OMRR team and Ms. Selig's Measure and Verification ("M&V") team worked together on requirements and set up a collaborative project tracking system.

23. In or around April of 2021, Defendant alleged that the company commissioned an audit with Baker Tilly who assessed Defendant's policies, procedures, and processes around the

3

M&V team's practices to determine whether the internal controls were designed appropriately and operating effectively. Ms. Selig completely embraced the audit process and cooperated fully because she believed there was room for improvement. However, the intention of this audit was never communicated to Ms. Selig.

24. In May of 2021, Ms. Selig participated in a meeting to discuss the findings in the Baker Tilly audit report. Many of the action items from the report were items that Ms. Selig had recommended to Baker Tilly because they were initiatives that she had been leading over the previous years, but she needed management support. Ms. Selig never neglected to correct the items in the Baker Tilly audit report as previously alleged by Defendant.

25. On May 11, 2021, Ms. Selig sent an email to CEO Tina Dolph ("Ms. Dolph") regarding her overall concerns after an internal M&V audit follow-up call. Ms. Selig tried to convey that M&V was on solid ground under her direction but that she needed support and issues needed to be addressed concerning other interrelated program development and execution processes.

26. In May of 2021, restructuring began at Defendant's company wherein the department in which Ms. Selig worked was restructured where Mr. Williams' group had a new direct manager, Ben Pewtress ("Mr. Pewtress"). This restructuring negatively impacted Mr. William's organization structure and it became apparent that the politics of the situation would interfere with the ability to conduct a proper transition. Any collaborative work between Ms. Selig's M&V team and the OMRR Team ceased. Mr. Pewtress was not engaged enough to care.

27. Defendants incorrectly alleged that Ms. Selig did provide Mr. Pewtress with requested financial performance data. However, Ms. Selig was never given the information regarding financial performance of the projects. In fact, Mr. Pewtress agreed with Ms. Selig that

4

she needed to be provided with this financial information, which she never received despite numerous verbal and written requests.

28. After Mr. Pewtress became direct manager, Ms. Selig assisted him as much as she could because her M&V team needed to communicate and collaborate with Mr. Pewtress' OMRR team. Throughout the summer, Ms. Selig worked diligently to provide Mr. Pewtress documents and backgrounds on projects. However, this reorganization under Mr. Pewtress reduced the communication and collaboration the M&V team had just recently established with the previous OMRR team in the spring of 2021.

29. Between May of 2021 and August of 2021, Ms. Selig spent a lot of time trying to ensure that Mr. Pewtress had all project OMRR documents that she had in order to help him get up to speed on the OMRR commitments. However, Mr. Pewtress did not do anything in return. Mr. Selig expressed her concerns about OMRR's needs. Mr. Pewtress only assigned a project manager to that project and two other projects, where there were 30 projects total. Most of the other OMRR action items were not addressed by him.

30. Between May of 2021 and August of 2021, Ms. Selig's requested new M&V engineering position had been approved to be posted, which supported the financials for the projects, and showed that the M&V team needed 7-8 full-time employees to support the project and contract requirements. The M&V team currently consisted of Ms. Selig and four other employees. However, this additional hiring was put on hold due to pending restructuring.

31. In August of 2021, a second restructuring of Defendant's company impacted Ms. Selig and her M&V team, where she was placed under direct management by Mr. Pewtress and his newly formed Technical Services group. Ms. Selig expressed her concern that she was pulled

5

out from engineering as a result of the restructuring. There were also layoffs as a result of this restructuring.

32. In September of 2021, Mr. Pewtress told Ms. Selig he was too busy with other proposals to address her concerns. He said he would address her concerns in October.

33. In October of 2021, Ms. Selig was informed by Mr. Pewtress that OMRR project manager responsibilities were going to be placed on Ms. Selig's M&V team on top of M&V responsibilities. Ms. Selig was not involved in making this decision.

34. On or about October 29, 2021, Ms. Selig had a discussion with her Human Resources representative, Rebecca Hannahs ("Ms. Hannahs"), about her concerns regarding the lack of resources. Ms. Selig also expressed concerns about her workload and hours (60-70 hours weekly) and how it was impacting her life and health.

35. On or about November 9, 2021, Ms. Selig received an email from Human Resources stating that Defendant was closing out the newly created M&V engineer position, which was still on hold from August. Ms. Selig objected stating that M&V needed additional resources, especially with the OMRR tasks now being placed on M&V. This did not change Defendant's position.

36. Mr. Pewtress never offered his assistance to Ms. Selig in November of 2021 to address audit items that remained unaddressed as alleged by Defendant. In November, Ms. Selig and Mr. Pewtress discussed the remaining open action items from the audit, where there were three or four still open out of 13 items. Therefore, most of the items had been addressed. Ms. Selig stated to Mr. Pewtress and Michael House that the remaining items needed management support in order to be completed. However, Mr. Pewtress directed Ms. Selig to "just submit anything and close them out".

37. On or about December 9, 2021, Ms. Selig had her annual review. At that time, there was a "flight risk" within Defendant's company where additional compensation could be requested if there was concern about an employee leaving the company. Ms. Selig only received a 1% lump sum compensation instead of a raise, and she was informed she would not receive a raise because she was already at the top of her pay grade. This was despite the fact that Ms. Selig's husband, who was in the same Technical Director position and had less experience than her, was given a raise by Defendant and not a lump sum payment. Ms. Selig was never provided with a written or verbal explanation, and she had to go to Human Resources to get information on her salary range. Upon information and belief, Ms. Selig was above the median of her salary range but not at the high end.

38. Ms. Selig's annual review only lasted five (5) minutes and was conducted by Mr. Pewtress, whom Ms. Selig reported to for only one month during the prior year. Ms. Selig was given a 3 out of 5 overall rating, and there was no attempt to retain her or make her feel like a valued employee. Mr. Pewtress provided no explanation for her review.

39. In January of 2022, the most senior M&V engineer, Walt Sysun, resigned, which resulted in his responsibilities having to be reassigned to the remaining members of an already stressed team. Ms. Selig expressed her concerns to Defendant, specifically the CFO and CEO, but her concerns were dismissed. Ms. Selig stated that she felt she was in a hostile work environment due to her concerns being dismissed, that there was a biased culture against women at Defendant's company, and that her work performance was being undermined. These concerns were summarized in an email from Ms. Selig dated January 31, 2022, to Tina Dolph, John Ustica, and Michael House. The email was also forwarded to Ms. Hannahs from Humans Resources. Nothing was done by Defendant to remedy the situation.

40. On or about January 28, 2022, when Ms. Selig and her CFO, John Ustica, had another meeting with the Baker Tilly auditors, Ms. Selig answered very specific questions asked by Baker Tilly. Ms. Selig informed Baker Tilly that changes had been made to the M&V team since the spring of 2021, including the reorganization and loss of M&V team members, which reduced the size of the M&V team while increasing responsibilities placed on the team. Ms. Selig made it clear that she needed engineering resources, and that her approved position in August had been cancelled despite having a very capable candidate ready to be given an offer.

41. Defendant alleged that during the aforementioned January 28, 2022, meeting was the first time Ms. Selig stated she was subjected to a hostile work environment. However, Ms. Selig had previously raised this issue in November and December of 2021 with Human Resources, especially after employees had internal training regarding what defined a hostile work environment. Ms. Selig reported that others were not communicating with her, and she was being circumvented by Mr. Pewtress going directly to her male team members instead of going to her. Human Resources' reply was that this would be very difficult to prove.

42. As a result of the adversity Ms. Selig faced while employed by Defendant, she was forced to resign and ended her employment on March 17, 2022.

43. Over a month later, Ms. Selig obtained new employment, with McKinstry, not EVO. Defendant erroneously stated that Ms. Selig "works for EVO, another engineering company focused on energy efficiency". EVO is not an engineering company but rather an international non-profit organization that provides services and tools to the world-wide energy efficiency industry, including the industry standard and preeminent protocol for M&V known as the IPMVP (International Performance Measurement and Verification Protocol). Ms. Selig was inducted into

8

Case 5:23-cv-00004-KDB-SCR    Document 1    Filed 01/11/23    Page 8 of 13

the IPMVP Technical Committee and has served as the IPMVP Committee Vice Chair for nearly ten years as a volunteer, not as an employee.

44. Ms. Selig never complained about not being laid off as alleged by Defendant. Upper management informed Ms. Selig in December that she was on the layoff list, but Defendant was not going to lay her off due to a "Human Resources issue". It became even more apparent to Ms. Selig that Defendant did not value any of the work she was doing, and she felt it may be better for Defendant to just lay her off in order for her to cut her losses.

45. Defendant has alleged that Ms. Selig had four individuals reporting to her prior to her resignation: Rebecca Kissinger, Ken Jackson, Andrew Lang, and Phil Santos. This is inaccurate as Andrew Lang and Phil Santos had reported to Ms. Selig, and they were part of the Commissioning Team (Cx Team), not the M&V Team, which had completely different responsibilities and the Cx Team had recently been removed from Ms. Selig's responsibility and were reorganized under a different SGT VP, Mr. Patrick Tobin. At the time of Ms. Selig's resignation, the M&V Team consisted of only Ken Jackson since William Martin had been moved to directly report to Ben Pewtress to focus on OMRR and Rebecca Kissinger had resigned in February 2022.

46. Defendant has alleged that Ms. Selig resigned from her employment after a meeting during which she was making excuses for her failure to perform as directed by her supervisor. However, such allegation is inaccurate as Ms. Selig always fulfilled her job requirements. She was never informed by Defendant that she was failing to perform. Ms. Selig had always received good performance reviews, including the 2021 review which did not mention any failures to perform or other performance issues, and she had also received Service Excellence awards from SGT.

47. Ms. Selig therefore believes and avers that Defendant discriminated against her due to her sex.

## COUNT I

### Discrimination and Retaliation on the Basis of Sex
### Violation of Title VII of the Civil Rights Act of 1964, as amended

48. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

49. In doing the acts alleged above and herein, Defendant discriminated and retaliated against Plaintiff on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*.

50. Defendant's discriminatory actions included, but were not limited to (1) limiting, segregating, or classifying Plaintiff in a way that adversely affected her opportunities or status because of her sex; (2) increasing the difficulty of Plaintiff's job and the hours she worked by depriving her of the resources that her male counterparts possessed; (3) refusing to increase Plaintiff's pay in the same amounts that her male counterparts received; (4) refusing to address Plaintiff's concerns about her hostile work environment and the biased culture against women at Defendant's company; (5) undermining Plaintiff's suggestions while giving credence to and empowering male employees; and (6) forcing Plaintiff to resign from her employment as a result of Defendant not addressing the concerns she expressed about the hostile work environment and biased culture against women.

51. Plaintiff genuinely believed Defendant was discriminating based on sex, and her belief was reasonable.

52. As a direct result of said conduct, Plaintiff has suffered lost past and future wages and job benefits and has suffered and will continue to suffer emotional pain, suffering,

inconvenience, embarrassment, mental anguish, and other non-pecuniary losses in an amount to be determined at trial.

## COUNT II

### Violation of the Equal Pay Act of 1963, 29 U.S.C. §206 et. seq.

53. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

54. Defendant has violated the Equal Pay Act of 1963 by providing Plaintiff with lower pay and compensation than similarly situated male employees who have less experience than her on the basis of their sex, even though Plaintiff performed similar duties requiring the same skill, effort, qualifications, and responsibility as her male counterparts.

55. Defendant was the cause of the unlawful conduct complained of in this claim.

56. The foregoing conduct constitutes a willful violation of the EPA within the meaning of the statute.

57. As a result of Defendant's conduct as alleged, Plaintiff has suffered, including but not limited to, lost earnings, lost benefits, and other financial loss, and is entitled to statutory, liquidated and other damages.

## COUNT III

### Wrongful Discharge in Violation of Public Policy - Violation of Title VII and EPA

58. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

59. Defendant employed at least fifteen (15) employees at all relevant times.

60. Defendant violated the public policy of North Carolina as set forth in N.C.G.S. § 143-422.1 by discriminating against Plaintiff because of her sex and providing Plaintiff with lower pay and compensation than similarly situated male employees as set forth in the paragraphs above.

61. As an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

62. Defendant's actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

63. Defendant's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief:

1. An Order awarding Plaintiff damages for Defendant's violation of Title VII of the Civil Rights Act of 1964, including backpay, lost wages, employment benefits, punitive damages, and any other compensation denied or lost because of Defendant's violation of Title VII of the Civil Rights Act of 1964;

2. An Order awarding Plaintiff damages for Defendants' violation of the EPA, including backpay, front pay, lost employment benefits, and any other compensation denied or lost because of Defendant's violation of the EPA;

3. An Order awarding Plaintiff compensatory damages for emotional distress, pain and suffering, inconvenience, and/or mental anguish in an amount to be proven at trial;

4. An Order awarding Plaintiff punitive damages under N.C. Gen. Stat. § 1D-115 in an amount to be proven at trial;

5. An Order awarding Plaintiff the costs of this action;

6. An Order awarding Plaintiff reasonable attorneys' fees;

7. An Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

8. An Order granting any other necessary or appropriate relief to which Plaintiff is entitled under the law.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NCSB#26590
GESSNER LAW, PLLC
602 East Morehead
G. G. Galloway House
Charlotte, North Carolina 28202
Tel: (704) 234-7442; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com

*Attorney for Plaintiff*